In the Matter of the Estate of ANNA PHIPPS TINKER, Deceased.

Surrogate's Court, New York County, November 6, 1935.

*McCloy, Romanoff & Bravman* [*H. H. Romanoff* and *Joseph F. McCloy* of counsel], for the petitioner, Dr. Charles Hendee Smith.

*Paul Windels, Corporation Counsel* [*Frederick V. P. Bryan, Milton I. Newman* and *William S. Gaud, Jr.*, of counsel], for the respondent City of New York.

*Irving I. Goldsmith*, for Louis Phipps Sanger, legatee.

*Frank Rashap*, for Katherine Sanger and Frank W. Sanger, legatees.

*Gwinn & Pell* [*John F. Le Viness, Jr.* of counsel], for the executor Guaranty Trust Company.

*John J. Bennett, Attorney-General* [*Robert P. Beyer, Assistant Attorney-General*, of counsel], for the State of New York.

FOLEY, S. In this proceeding specially brought for the construction of the will, the question arises as to the identity of a charitable legatee named in it. Mrs. Tinker died on June 30, 1934. Her will was executed on September 18, 1930. In it she made gifts " to Bellevue Hospital, situate at 26th Street and First Avenue, New York, New York, for the benefit of the Children's Medical Division." Certain of these gifts are by way of remainders of trusts subject to the life estates of designated persons. The remaining gift is an outright legacy of one-half of the residue to the institution named in the will. The pecuniary benefits to the named charitable beneficiary aggregate $260,000.

Various contentions have been raised by the parties as to the validity of the bequests and the identity of the charitable corporation intended by Mrs. Tinker. The existence of a latent ambiguity in the will has been established by proof that there are two institutions or forms of charitable activity which are known by exactly the same name as that used by Mrs. Tinker in her will. One is an institution maintained by New York University. The other is an institution maintained by the city of New York.

In support of the claims of New York University, Dr. Charles Hendee Smith is the petitioner in this proceeding. He contends that the funds bequeathed should be paid over to New York Uni-

versity for the benefit of its Children's Medical Division. It has been proven that for some time prior to the execution of the will, there was maintained in Bellevue Hospital, by that university, a branch of the activities of its medical college which has been commonly known as " Bellevue Hospital, Children's Medical Division " or " Children's Medical Division of Bellevue Hospital." The medical departments of Bellevue Hospital are composed of four divisions. There is a medical superintendent of the entire hospital, who is appointed by the commissioner of hospitals of the city of New York. He is the administrative head of the hospital. The medical care of the patients of three of the divisions is furnished by physicians appointed by the commissioner of hospitals upon the recommendation respectively of New York University, Cornell University and Columbia University. The fourth division is known as the Open Division. The Children's Medical Division functions under the direction of physicians exclusively recommended by New York University.

Dr. Smith, by appointment of the dean of the medical college of New York University, has acted as the director of the Children's Medical Division for a period of years previous to and since the date of the execution of Mrs. Tinker's will. He has been connected with the division since 1916, and has been director since 1925.

On the other hand, the city of New York, through its corporation counsel, contends that it is entitled to the benefits contained in the will because Bellevue Hospital is a public institution maintained by the city through its department of hospitals and the Children's Medical Division is a branch of that hospital.

Preliminarily, I hold that the charitable gifts under the will did not fail because Mrs. Tinker named the hospital and its division, rather than specifically designating the city of New York or New York University as the legatee. We may save the gift to the parent corporation actually intended by the testatrix by applying the rule laid down in *Kernochan* v. *Farmers' Loan & Trust Co.* (187 App. Div. 668; affd., 227 N. Y. 658). It was held in that case that a legacy could not be defeated by a misnomer and that where the name found in the will is a branch or a local designation of the particular work carried on by a charitable corporation, the will may be sustained and the payment of the legacy may be decreed to the parent corporation.

On the question of the identity of the legatee named in the present will, extrinsic testimony was received by the surrogate in order to dissolve the ambiguity caused by the conflicting claims of the two corporations. (*Baumann* v. *Steingester*, 213 N. Y. 328; *Matter of Van Vliet*, 224 id. 572; *Lefevre* v. *Lefevre*, 59 id. 434; *Matter of*

*Coughlin*, 220 id. 681, affg. 171 App. Div. 662; Beal's Cardinal Rules of Legal Interpretation [2d ed.], p. 580.) This extrinsic evidence consisted of two classes: (1) The activities of the city of New York and of New York University, respectively, in the designated division of Bellevue Hospital; (2) the circumstances leading up to the making of the will and the conversations and the declarations of the testatrix bearing upon her intent. The rule in such situations which permits the letting in of extrinsic evidence was tersely stated by Chancellor WALWORTH in *Pritchard* v. *Hicks* (1 Paige Ch. 270): " where the words of a will are equally applicable to two persons or two things, the intention of the donor shall not, for that cause, be defeated; but parol evidence may be received to show which person was the object of his bounty, or which article he intended for the donee." There are certain limitations on the rule permitting resort to extrinsic proof, which forbid evidence of declarations as to direct intent where an attempt is made to supply the name of a legatee left wholly blank in the will, or where the name employed in it describes with reasonable accuracy only one of the claimants to the legacy. (*Lefevre* v. *Lefevre, supra; Leggett* v. *Stevens*, 185 N. Y. 70; *St. Luke's Home* v. *Association for Indigent Females*, 52 id. 191; *Union Trust Co.* v. *St. Luke's Hospital*, 74 App. Div. 330; affd., 175 N. Y. 505.) These limitations have no application to the pending proceeding, which is a clear example of latent ambiguity and equivocation and requires evidence of surrounding circumstances, instructions and declarations of intent by the testatrix, in order to supply the testatrix's own identification of the object of her bounty. (*Matter of Wheeler*, 32 App. Div. 183; affd., 161 N. Y. 652.)

Upon the issue of intent of the testatrix, testimony was accordingly received on behalf of the petitioner which clearly and convincingly establishes that Mrs. Tinker intended that the charitable beneficiary in her will was the Children's Medical Division maintained in Bellevue Hospital by New York University and not by the city of New York.

It appears that shortly before the execution of the will, Mrs. Tinker visited Mrs. Elizabeth F. Claflin in Morristown, N. J. Mrs. Tinker was a cousin of Mrs. Claflin's husband and they had been intimate friends for forty years. Mrs. Tinker remained at the home of Mrs. Claflin for several weeks. During this period the will was prepared and executed by her. Mrs. Tinker first broached her intention to make a will to Mrs. Claflin. She informed Mrs. Claflin that she was going to leave a large portion of her property, which came through her husband, to some charity where it would be used for the benefit of children. She spoke of the interest of her

husband, who had been a doctor in New York city, in the welfare of children. Mrs. Claflin informed her that she had been contributing to the benefit of the Children's Medical Division of Bellevue Hospital. She mentioned the fact that Dr. Smith, the petitioner, was the head of that division, and said: " I do not think you would make any mistake leaving it in that way, and if you ask my advice I would suggest that you leave it to the Children's Medical Division of which Dr. Smith is the head." She informed Mrs. Tinker that she had made several contributions to the fund maintained by Dr. Smith for this work. She informed her of the nature of the work that was done in the Children's Medical Division under Dr. Smith's medical supervision, particularly in their out-patient department after the treatment of the child in the hospital had been completed. She gave her the name of the fund which was maintained by Dr. Smith as the " Children's Medical Division " and she was familiar with the name of the fund because of her repeated contributions to it. Within a few days subsequent to this conversation, there followed, in rapid sequence, the giving of instructions by Mrs. Tinker to the attorney who drafted the will, its preparation and execution.

Mrs. Claflin testified that, after its execution, Mrs. Tinker spoke several times of the disposition she had made in the will and of the satisfaction she had in leaving her property the way she did, especially because " the little children are going to benefit."

Mrs. Claflin also identified two slips of paper with pencil notations upon them in the handwriting of Mrs. Claflin's husband. These slips were subsequently delivered by Mrs. Tinker to the attorney who drew the will. They contained specific instructions as to legacies to relatives and friends, as to trusts with the names of the beneficiaries. There was an additional important notation that after the death of certain beneficiaries " the entire principal of my estate remaining in hands of the Trust Co., shall be paid to Bellevue Hospital, for the benefit of the Children's Medical Division of the Hospital. Nearly all my property came from my husband, Dr. Horace H. Tinker. He loved children and was glad to give his services without compensation to needy children during his life. I am sure that he would heartily approve the designation of Bellevue Hospital, Children's Medical Division, as the ultimate beneficiary of my Estate and I am glad to make this bequest in memory of him." Mrs. Claflin did not testify as to the actual facts surrounding the writing of these two slips by her husband, or as to whether the notations were made by Mr. Claflin at the direction of Mrs. Tinker. The circumstances, however, admit of the latter inference, particularly when considered in connection with the testimony of

the attorney who drafted the will. Similar memoranda of instructions delivered to the draftsman were regarded as of importance in the pursuit and determination of intent in *Matter of Coughlin* (171 App. Div. 662; affd. on opinion below, 220 N. Y. 681).

The will was drawn by a New York attorney, Caleb C. Curtis. He was also one of the subscribing witnesses. He identified the written slips of instructions in the handwriting of Mr. Claflin and testified that they had been given to him by Mrs. Tinker. They were used as a basis for most of the provisions actually written into the will in its final form. The notation of her reasons for leaving her money to Bellevue Hospital for the benefit of the Children's Medical Division was embodied in substance in the will. Mrs. Tinker asked that the will be drawn from these memoranda, together with other data which she gave him. The will was subsequently executed in Mrs. Claflin's home at Morristown, N. J., where the decedent was confined to bed with a broken hip. No other instructions concerning the name of the charitable institution were given to the draftsman by the testatrix. The name of the city of New York as a prospective beneficiary was never mentioned by Mrs. Tinker.

The testimony of Mr. Curtis was received by me under the rule laid down in *Matter of Coughlin* (171 App. Div. 662; affd. on opinion below, 220 N. Y. 681). In the *Coughlin* case objection was made to the competency of the attorney to testify to privileged communications with his client. The testimony, however, of the attorney was held by the appellate courts not to be privileged. (Code Civ. Proc. § 836, now Civ. Prac. Act, § 354, as amplified by recent amendments not material here.) That section permits an attorney who participates in the making of a will to testify in a probate proceeding to communications with his client, the maker of the will, as to its preparation and execution. It has been argued before me by counsel for the city of New York that the rule in the *Coughlin* case must be applied strictly and that the statutory abrogation of the confidential communication rule permits the attorney to testify under section 354 of the Civil Practice Act, to communications and instructions only in a probate proceeding. I do not believe that the section should be construed in that very technical manner. Under the statutory procedure of the Surrogate's Court, a will may be construed in various proceedings, (1) in a probate proceeding, (2) in a special independent proceeding brought for construction only, (3) in an accounting proceeding ( Surr. Ct. Act, § 145). Under the customary procedure in this court, the interpretation of the provisions of the instrument is sometimes sought in the probate proceeding after service of citation on all the persons whose interests

may be affected. Such requests for construction sometimes arise in proceedings where the validity of the execution of the paper is disputed. If the will be held valid, in such cases, in order to avoid delay in administration, the will is admitted to probate by appropriate decree, letters are issued and the question of construction of its terms is determined by supplemental decree in the same probate proceeding. In such cases probate logically precedes construction. (*Matter of Davis*, 182 N. Y. 468.) In other cases, where no contest over the validity of the paper as a will is raised, the will is construed by the final decree of probate.

I can see no distinction between permitting an attorney to testify upon construction in a probate proceeding and permitting him to testify in any subsequent proceeding brought independently, as is the case here, or in an accounting proceeding. The issue of interpretation and the objective of a judicial determination of the construction of the will are exactly similar in each type of proceeding. From the moment that the will is filed for probate, the opportunity of obtaining a construction is available. The statutory abrogation of the confidential communication rule then becomes effective under section 354. But the privilege has been abolished for all future proceedings involving a search for the meaning of the will. It would be an extremely narrow and technical interpretation which would unseal the lips of the draftsman in a probate proceeding only, and close them in every other subsequent proceeding involving the same relief. I accordingly hold that the testimony of Mr. Curtis, the attorney here, was competent. Even if his testimony and the memoranda in Mr. Claflin's handwriting delivered to him by Mrs. Tinker were excluded, there would be sufficient evidence in the testimony of Mrs. Claflin to justify the conclusion reached by me as to Mrs. Tinker's intent.

The evidence and the sequence of events from the time of the first conversation between Mrs. Claflin and Mrs. Tinker, and the suggestion by the former of the Children's Medical Division of Bellevue Hospital, of which Dr. Smith was director, down to the time of the execution of the will, conclusively show that Mrs. Tinker intended by her will to benefit the activities conducted not by the city of New York in Bellevue Hospital, but the activities and charitable purposes maintained by New York University in its Children's Medical Division of Bellevue Hospital. (*Kernochan* v. *Farmers' Loan & Trust Co.*, 187 App. Div. 668; affd., 227 N. Y. 658.)

In the determination of the question as to which corporation is entitled to the bequests, under Mrs. Tinker's will, it is of minor importance as to whether the funds shall be expended under the supervision of the commissioner of hospitals of the city of New

York or by New York University. The children who become patients of the division must ultimately benefit regardless of the agency which expends the funds. The important question is the identity of the legatee intended by the testatrix. The city maintains by generous appropriations the charitable activities of the hospital for the benefit of the sick and injured. New York University, on the other hand, has appropriated and applied large amounts of moneys to amplify the pecuniary support which the city provides. The university supplies the services of physicians, nurses and other expert employees for the medical care of the children. At its expense, equipment and supplies have been furnished for this worthy cause. In addition, the medical college furnishes the services of specialists, who serve without compensation. The moneys furnished by the university have come from its general funds or from contributions collected by Dr. Smith from persons charitably inclined. He has raised annually the sum of $30,000 and the collection and disbursement of these moneys have been accounted for by him to the university authorities.

The designation of the agency, whether the city or university, selected to expend the legacies under Mrs. Tinker's will is, therefore, of small concern, for the same persons will ultimately benefit. It is of the greatest importance, however, that the intent of Mrs. Tinker should be carried out. The evidence admits of only one conclusion — that the city of New York was not to manage the funds, but that they were to be administered by the university and its officers in charge of the designated division of Bellevue.

I, therefore, hold that the various bequests and remainder interests contained in the will vested in New York University for the charitable purposes set forth by the testatrix.

My conclusion that the charitable gifts under the will are valid and effective necessarily compels the overruling of the further contention raised by the executors that the gifts failed and the property passed by intestacy. There is an *in terrorem* clause contained in the testamentary instrument, but the controversy here in which the next of kin directly asserted no ground of invalidity cannot nullify the gifts for those next of kin who are named as beneficiaries.

Submit decree on notice construing the will accordingly.